DECISION AND JUDGMENT ENTRY
Robert Walter O'Donnell appeals his convictions for complicity to aggravated burglary and two counts of complicity to kidnapping with a firearm specification in the Scioto County Common Pleas Court. He assigns the following errors for our review:
FIRST ASSIGNMENT OF ERROR
 THE COURT ERRED IN NOT GRANTING APPELLANT-DEFENDANT'S MOTION FOR SPECIFICITY IN THE BILL OF PARTICULARS OR OTHERWISE DISMISS THE COMPLAINT [sic].
 SECOND ASSIGNMENT OF ERROR
 THE COURT ERRED IN NOT GRANTING APPELLANT-DEFENDANT'S MOTION IN LIMINE.
 THIRD ASSIGNMENT OF ERROR
 THE COURT ERRED IN NOT GRANTING APPELLANT-DEFENDANT'S MOTION TO ACQUIT AT THE COMPLETION OF THE STATE'S CASE.
 FOURTH ASSIGNMENT OF ERROR
 THE TRIAL COURT ERRED IN NOT GRANTING APPELLANT- DEFENDANT'S MOTION FOR JURY INSTRUCTIONS ON ABDUCTION.
 FIFTH ASSIGNMENT OF ERROR
 THE CONVICTION OF APPELLANT-DEFENDANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Finding no merit in any of the assigned errors, we affirm appellant's convictions.
 I.
On August 3, 1997, Jim and Annette Stevens returned to their home in Jackson County from a boating excursion with appellant and his wife, Betty. As they walked down the steps to their home, two men wearing masks with "FBI" on them approached the Stevenses. The men showed Jim what Annette believed to be badges and a warrant. The "FBI agents" had a long gun and a handgun pointed at the Stevenses while they entered the house. Annette and Jim were handcuffed and duct tape was placed over their eyes. The "FBI agents" stated that the Stevenses were under arrest and the agents searched their home.
After a short period of time, the Stevenses were taken out of the house and placed in the back seat of a vehicle. They were then driven somewhere and removed from the vehicle. Jim and Annette were separated and each was beaten, tortured and drugged. They were then taken to a barn and again separated, beaten and tortured. Their assailants indicated that they wanted money and would torture Jim and Annette until one of them told the assailants where some money was located.
Eventually, Jim Stevens told the assailants that the money they were seeking was located in a storage bin and the assailants stole the money. After several more hours of torture, Jim and Annette were given some pills to take. They were then left in their truck a short distance from their home.
During the trial, the state conceded that appellant was not present when the Stevenses' home was burglarized and they were taken away. Rather, the state argued that appellant was guilty of complicity to burglary and complicity to kidnapping.[1] Specifically, the state alleged that appellant suggested the kidnapping, provided the assailants with information regarding the victims, and was present for some period of time at the location where the victims were being held. The state called several witnesses, including others involved with the Stevenses' kidnapping, to prove its case. Appellant maintained that he never suggested the kidnapping and, while he may have been present during some discussions regarding the kidnapping, he was not a participant in the planning. A summary of the testimony of the witnesses is attached to this opinion as an appendix.
After the jury credited the state's version of the events and found appellant guilty of all charges, he filed this appeal.
 II.
In his first assignment of error, appellant argues that the trial court erred in denying his alternative motions for specificity in the bill of particulars or dismissal of the complaint. He asserts that the state failed to set up specifically the nature of the offense charged and "the conduct of the Defendant alleged to constitute the offense."
The bill of particulars acts to "inform an accused of the exact nature of the charges against him so that he can prepare his defense thereto."State v. Fowler (1963), 174 Ohio St. 362, 364. However, its purpose is not to provide specifications of evidence or to serve as a substitute for discovery. State v. Lawrinson (1990), 49 Ohio St.3d 238, 239; State v.Sellards (1985), 17 Ohio St.3d 169, 171. When a defendant requests more specific information than provided in the bill of particulars, the trial court must consider (1) whether the state possesses the specific information requested by the defendant, and (2) whether this information is material to the defendant's ability to prepare and present a defense.Lawrinson, supra. If both questions are answered in the affirmative, the state must provide the information to the defendant. Id.
Appellant was indicted on charges of burglary and kidnapping with a firearm specification. He requested a bill of particulars and discovery, which the state provided. The bill of particulars states:
Prior to August 3, 1997, Sharon Crowder along with her husband, Charles Crowder, Randy Clausing and Bobby O'Donnell, discussed going to Jackson County, Ohio, to kidnap a couple for their money. One or more trips were made by the co- conspirators to the victim's [sic] house prior to the crime. Sharon Crowder helped make masks to conceal the identity of the co-conspirators when the crime took place. On August 3, 1997, while Bobby O'Donnell was with the victims boating on the Ohio River, Sharon Crowder, her husband and Randy Clausing went to the victim's [sic] residence and waited for their return. When the victims showed up, the three seized the victims in their house and after threatening them with a gun, bound, gagged and blindfolded them.
The victims were taken to Randy Clausing's residence on Maple-Benner Road in Scioto County, where they were tortured and abused by the three co-conspirators, in order to obtain money. Later that evening, Sharon Crowder went back to the victim's [sic] residence, entered, and searched for money or other property to steal.
As part of its discovery, the state provided appellant with a list of witnesses it expected to call and the statements made to the investigating officer by appellant's co-defendants. These statements included Charles Crowder's statement that appellant set the kidnapping up because the Stevenses were drug dealers and they could get their money.[2]
Crowder also stated that appellant got $2,000 of the Stevenses' money and was mad because he was supposed to get $2,500. John Wooten stated that he heard Charles Crowder, Randy Clausing and appellant plan the abduction. Randy Clausing stated that appellant set the kidnapping up.
Approximately two months after the state filed the bill of particulars and the discovery information, appellant filed a motion for specificity in the bill of particulars or dismissal of the indictment. The motion requested "specific dates, times, places and occurrences that support the allegations of criminal conduct against [appellant]." In its response to this motion, the state indicated that the discussions between the co-conspirators took place between May 1997 and August 1997. The state further indicated that due to the length of time since the discussions and the fact that the co-conspirators were friends who associated with each other several times a week, it could not provide more specific information.
The state then indicated that appellant was being charged with burglary and kidnapping as a result of his complicity and acknowledged that appellant did not physically seize the victims. The state informed appellant that the evidence would show that appellant "solicited or procured," "aided or abetted," and "conspired" with Charles Crowder, Sharon Crowder and Randy Clausing to commit these crimes. The court denied appellant's motion.
As pertains to appellant, the bill of particulars states only that appellant "discussed" the kidnapping of the victims with the other co- conspirators, went to the victims' home with the co-conspirators on one or more occasions, and was out boating with the victims on the day of their abduction. Taken in conjunction with the discovery materials and the additional statements the state provided in its response to appellant's motion, we believe that appellant was sufficiently apprised of the nature of the offense and what the state intended to prove. Further, it is apparent that the state did not possess specific information regarding the dates and places where the kidnapping plans occurred. As the state did not possess this information, the trial court did not err in denying appellant's motion.
At any rate, even assuming that appellant's position is correct and the court erred in denying his motion, appellant has not demonstrated any resulting prejudice. Any harmless error which does not affect substantial rights should be disregarded. Crim.R. 52(A). Appellant has not directed us to any specific information that the state possessed and wrongfully failed to provide which affected his right to defend himself.
Accordingly, we overrule appellant's first assignment of error.
 III.
In his second assignment of error, appellant alleges that the court erred in denying his motion in limine to preclude evidence of the kidnapping of Michael Pack. The state argues that appellant did not properly object to this evidence and therefore waived any error. Alternatively, the state argues that the evidence is admissible to show amodus operandi.
It is well settled that a decision in limine is tentative, interlocutory and in anticipation of the court's ruling during trial. SeeMcCabe/Marra Co. v. Dover (1995), 100 Ohio App.3d 139, 160; Collins v.Storer Communications, Inc. (1989), 65 Ohio App.3d 443, 446. A grant or denial of a motion in limine does not preserve error for appellate review. State v. Hill (1996), 75 Ohio St.3d 195, 202-203. Instead, the parties must renew their motions or objections at the appropriate time during trial in order to preserve the matter for appeal. See State v.Brown (1988), 38 Ohio St.3d 305, at paragraph three of the syllabus;State v. Grubb (1986), 28 Ohio St.3d 199, at paragraph two of the syllabus.
Appellant filed a motion in limine to preclude testimony regarding appellant's participation in the kidnapping of Michael Pack in Licking County. During the prosecutor's opening statement, defense counsel objected to statements regarding the Pack kidnapping but the court overruled these objections. Sharon Crowder testified that she came home one day and her husband informed her that he had kidnapped a drug dealer, Michael Pack. She further testified that appellant, Chuck Crowder and Charlie O'Dell took Pack to his house "or wherever they were taking him." Mrs. Crowder also testified that appellant pled guilty to this offense. Defense counsel never objected to any of this testimony.
Later in its case-in-chief, the state called Bruce Meyers, a lieutenant with the Licking County Sheriff's Department, to the stand. Defense counsel objected prior to the commencement of direct examination to any testimony regarding the kidnapping of Michael Pack. The court overruled this objection. Lieutenant Meyers went on to provide much more detailed testimony than Mrs. Crowder had provided regarding the Pack kidnapping.
We agree with the state that appellant's objection during the state's opening statement was insufficient to preserve his objection to Mrs. Crowder's testimony. However, because he renewed his objection prior to Lieutenant Meyers' testimony, we must conclude that appellant preserved his objection to the testimony that followed. As the jury would already have known that appellant participated in the Pack kidnapping, we do not know that Lieutenant Meyers' testimony could have prejudiced appellant's defense. However, because Lieutenant Meyers described the abduction of Michael Pack in much greater detail, we will consider whether his testimony was appropriate.
The admission of relevant evidence is within the sound discretion of the trial court and its decision to admit or exclude such evidence cannot be reversed absent a showing of an abuse of that discretion. Rigby v.Lake Cty. (1991), 58 Ohio St.3d 269, 271; see, also, State v. Sage
(1987), 31 Ohio St.3d 173, paragraph two of the syllabus. To demonstrate an abuse of discretion, an appellant must show that the trial court's ruling was arbitrary, unreasonable or unconscionable. See WilmingtonSteel Products, Inc. v. Cleveland Elec. Illuminating Co. (1991),60 Ohio St.3d 120, 122.
Under Evid.R. 404(B), other acts evidence "is not admissible to prove the character of a person in order to show that he acted in conformity therewith." However, other acts may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. "Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B)." State v. Jamison (1990),49 Ohio St.3d 182, syllabus. The other acts "need not be the same as or similar to the crime charged" in order to be admissible. Id. However, the other acts should establish a modus operandi that shares common features with the charged crime and is identifiable with the defendant. State v.Lowe (1994), 69 Ohio St.3d 527, 531. In addition, there must be substantial proof that the defendant committed the other acts. Id. at 530.
There is no question that appellant was involved in the Michael Pack kidnapping as he pled guilty to kidnapping and complicity to extortion arising out of those events. Lieutenant Meyers' testimony established that Pack's mother found a large amount of blood in Pack's garage and contacted the police to report him missing. It was later learned that he was kidnapped from his home, taken to Chuck Crowder's residence and kept in a van inside of a garage. A ransom demand was made to Pack's wife and $50,000 was eventually exchanged for Pack.
Lieutenant Meyers also testified that appellant stated that he'd traveled to some storage buildings in Columbus where Pack supposedly kept large quantities of marijuana. Appellant admitted returning to Pack's house to find a syringe that Mr. Crowder left during the kidnapping and traveling to Pack's home in Mt. Vernon to look for money that was buried in a container in the backyard. Lieutenant Meyers testified that Sharon Crowder, Charles O'Dell, Betty O'Donnell, appellant, Tricia Caywood and Chuck Crowder were arrested for activities relating to the Pack kidnapping. The evidence also showed that appellant was familiar with Michael Pack through Jim and Annette Stevens and believed Pack was a drug dealer.
We agree with the trial court that there is enough similarity between the two crimes to allow the testimony regarding appellant's involvement in the Pack kidnapping. Both crimes involved the kidnapping of appellant's acquaintances who were believed to be drug dealers with significant amounts of cash. All three victims were removed from their homes and taken to one of the abductors' barns or garages. Both Pack and Annette Stevens were kept inside a vehicle. Further, many of the same co- conspirators were involved in both kidnappings. Therefore, we conclude that the trial court did not abuse its discretion in finding that the testimony pertaining to the Pack kidnapping is admissible to show modus operandi.
Appellant's second assignment of error is overruled.
 IV.
In his third assignment of error, appellant argues that the court erred in denying his motion to acquit at the completion of the state's case. In his fifth assignment of error, appellant argues that his conviction is against the manifest weight of the evidence. We consider these assignments together.
A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence presented at trial. See State v. Williams (1996),74 Ohio St.3d 569, 576; State v. Miley (1996), 114 Ohio App.3d 738, 742. Crim.R. 29(A) allows a trial court to enter a judgment of acquittal when the state's evidence is insufficient to sustain a conviction. The trial court may not grant a defendant's Crim.R. 29(A) motion, however, "if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus. In making this determination, the trial court must construe the evidence in a light most favorable to the prosecution. Id. at 263. An appellate court undertakes de novo review of the trial court's decision on a Crim.R. 29(A) motion and will not reverse the trial court's judgment unless reasonable minds could only reach the conclusion that the evidence failed to prove all the elements of the crime beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus; see, also, Miley, supra, at 742. If any rational trier of fact could have found the essential elements of an offense proven beyond a reasonable doubt, the appellate court will not disturb a conviction. Williams,supra, at 576; Jenks, supra, at 273.
First, appellant argues that the evidence is insufficient to establish that he engaged in complicity to commit aggravated burglary. He submits that there was "no testimony that there was a purpose to commit any criminal offense in the house." However, in the next sentence he admits that the only reason the co-conspirators entered the house was to kidnap the Stevenses.
R.C. 2911.11 states:
 (A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:
* * *
 (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.
 (B) Whoever violates this section is guilty of aggravated burglary, a felony of the first degree.
Appellant seems to be arguing that because nothing was stolen from the Stevenses' home when they were kidnapped, appellant cannot be convicted of complicity to aggravated burglary. One need not commit a crime involving theft to be guilty of aggravated burglary under the current version of R.C. 2911.11; one need only enter an occupied dwelling with the purpose of committing any criminal offense.[3]
The evidence shows that Sharon Crowder, Chuck Crowder and Randy Clausing entered the Stevenses' residence by force and deception, while in possession of two deadly weapons, for the purpose of kidnapping Jim and Annette Stevens. It is irrelevant that nothing was stolen from the home at the time the Stevenses were kidnapped as theft is not a specific element of aggravated burglary.
Appellant also argues that his only connection with the Stevenses' kidnapping was "conversation" about it. He submits that he was not present when the victims were kidnapped and the testimony establishes that the decision to kidnap the Stevenses that day was made only because Chuck Crowder learned that the victims would be out boating with appellant and his wife. Appellant submits that he never took such an affirmative action that he can be found guilty of complicity to commit these crimes.
In State v. Mootispaw (1996), 110 Ohio App.3d 566, 570, we noted that mere presence at the scene of a crime is insufficient to allow a case to proceed to a jury. The state must establish that appellant took some affirmative action to "assist, encourage, or participate in the crime by some act, deed, word, or gesture." Id.
Despite appellant's contentions, mere "conversation" can be sufficient to establish complicity to commit a crime in some circumstances. There is some evidence to show that these "conversations" appellant engaged in were to plan the kidnapping of the Stevenses with the goal of stealing a large sum of money appellant believed the victims possessed.
Furthermore, there is evidence that appellant did more than merely discuss the kidnapping with his accomplices. Randy Clausing testified that appellant came to his residence while the Stevenses were being held and kicked Jim Stevens, apparently in an attempt to coerce Mr. Stevens into revealing the location of the money.
In sum, there is sufficient evidence, based on the testimony of the state's witnesses, to show that appellant informed Chuck Crowder, Randy Clausing, and others that he was a friend of the Stevenses and that they had large sums of money. There is also evidence that, at various times, appellant and others attempted to find the money on the Stevenses' property. When they were unsuccessful, they decided to kidnap the Stevenses and force them to reveal the location of the money. According to the state's witnesses, appellant provided Chuck Crowder and the others with various information, including the habits of the victims and their plans on the day of the kidnapping, which would allow them to successfully implement their plan.
There was sufficient evidence for a rational finder of fact to conclude that appellant was guilty of complicity to burglary and complicity to kidnapping beyond a reasonable doubt. The trial court correctly submitted this case to a jury and did not err in denying appellant's motion for judgment of acquittal. Therefore, we overrule appellant's third assignment of error.
Our role in a manifest weight of the evidence inquiry is to determine whether the evidence produced at trial "attains the high degree of probative force and certainty required of a criminal conviction." Statev. Getsy (1998), 84 Ohio St.3d 180, 193. To make this determination, we must "review the record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial granted." State v.Stepp (1997), 117 Ohio App.3d 561, 567. If the record contains substantial evidence upon which a trier of fact could conclude that the state proved its case beyond a reasonable doubt, we will not reverse a conviction. Getsy, supra, at 193-194; State v. Eskridge (1988),38 Ohio St.3d 56, paragraph two of the syllabus.
This was a difficult case in that the apparent "ringleader" died prior to appellant's trial, though he may not have testified even if he had survived. It was also difficult as there was no physical evidence and the state relied almost exclusively on the testimony of the other participants in the crime, most of whom had criminal convictions. There was, however, no dispute that the crime actually occurred. The only question was whether appellant intended to assist with the kidnapping or unwittingly provided the kidnappers with information they needed to accomplish their deed.
We are guided by the presumption that the jury's factual findings are correct because of the knowledge that the jury "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 79. The jury obviously credited the state's witnesses' testimony regarding the role appellant played in this scheme. Further, there is evidence that appellant was a participant in the Pack kidnapping which followed much the same pattern as the Stevens kidnapping. Appellant was also the only link between the Stevenses and the co-conspirators, as well as Michael Pack and the co-conspirators.
Having carefully reviewed the record, we cannot conclude that the jury clearly lost its way in finding appellant guilty. Appellant's convictions are not against the manifest weight of the evidence and his fifth assignment of error is overruled.
 V.
In his fourth assignment of error, appellant argues that the court erred in denying appellant's motion for a jury instruction on the charge of abduction. Appellant contends that abduction is a lesser included offense of kidnapping and the instruction should have been given to the jury upon appellant's request.
An offense may be a lesser included offense of another when (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense. State v. Deem (1988), 40 Ohio St.3d 205, paragraph three of the syllabus.
R.C. 2905.01 provides that:
 (A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
* * *
 (2) To facilitate the commission of any felony or flight thereafter;
 (3) To terrorize, or to inflict serious physical harm on the victim or another;
* * *
 (C) Whoever violates this section is guilty of kidnapping, a felony of the first degree. If the offender releases the victim in a safe place unharmed, kidnapping is a felony of the second degree.
R.C. 2905.02 provides that:
 (A) No person, without privilege to do so, shall knowingly do any of the following:
 (1) By force or threat, remove another from the place where the other person is found;
 (2) By force or threat, restrain the liberty of another person, under circumstances which create a risk of physical harm to the victim, or place the other person in fear;
* * *
 (B) Whoever violates this section is guilty of abduction, a felony of the third degree.
In State v. Simmons (Dec. 20, 1995), Scioto App. No. 94CA2281, unreported, this Court held that abduction is a lesser included offense of kidnapping. However, this holding was criticized by the Second District Court of Appeals in State v. Fleming (1996), 114 Ohio App.3d 294. The Fleming court noted that kidnapping, as statutorily defined, may be committed entirely by means of deception but abduction, as statutorily defined, cannot be committed by means of deception. Id. at 297. Abduction can only be committed by means of force or threat. Id. Therefore, the second prong of the Deem test is not satisfied because the greater offense, kidnapping, can, as statutorily defined, be committed without the lesser offense, abduction, as statutorily defined, also being committed. Id. at 297-298.
We need not reconsider our holding in Simmons, however, because we find that the abduction charge was not appropriate even if it is a lesser included offense of kidnapping. An instruction on a lesser included offense is required only when the court determines that sufficient evidence has been presented that would reasonably allow a jury to reject the greater offense and find the defendant guilty on the lesser offense.State v. Shane (1992), 63 Ohio St.3d 630, 632-633. No evidence was presented by either party which would have caused the jury to find appellant guilty of abduction but not guilty of kidnapping. Appellant presented a defense that he was not involved in the planning of the kidnapping but was merely present when discussions took place. The facts surrounding the kidnapping itself were not in dispute. No reasonable trier of fact would have found appellant guilty of abduction but not guilty of kidnapping. Therefore, no instruction on abduction was required.
Appellant's fourth assignment of error is overruled.
 VI.
Having found no merit in any of appellant's assignments of errors, we affirm the judgment of the trial court.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
 _______________________ William H. Harsha, Judge
Abele, P.J.: Concurs in Judgment and Opinion
Evans, J.: Concurs in Judgment Only
[1]: R.C. 2923.03, which defines complicity, states:
 (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
(1) Solicit or procure another to commit the offense;
(2) Aid or abet another in committing the offense;
 (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
 (4) Cause an innocent or irresponsible person to commit the offense.
* * *
 (F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense.
[2] Charles Crowder died in prison while serving a sentence in another case and awaiting trial for his part in the Stevenses' kidnapping.
[3] The legislature amended R.C. 2911.11 to remove the language referring to theft offenses. Prior to July 1, 1996, a person committed aggravated burglary when he trespassed in an occupied structure "with purpose to commit therein any theft offense * * * or any felony * * *."
APPENDIX
Sharon Crowder
Sharon Crowder testified that she was married to Charles ("Chuck") Crowder, who is now deceased. She testified that their relationship was terrible and he was very abusive. Mrs. Crowder testified that Chuck was in the penitentiary serving time for the kidnapping of Michael Pack when he died. Pack was taken to the garage adjoining the Crowder home. However, Mrs. Crowder testified that she did not know Pack was kidnapped until she came home one day and Chuck informed her that he had "a drug dealer over there." Mrs. Crowder testified that appellant, Chuck and Charlie O'Dell took Pack back to his house "or wherever they were taking him" after the kidnapping. Mrs. Crowder and Betty O'Donnell, appellant's wife, drove Pack's van and a green car to Circleville where they were arrested by the FBI. Mrs. Crowder pled guilty to complicity to extortion. Chuck, appellant and Betty also pled guilty to various offenses.
Mrs. Crowder admitted that she recently pled guilty to conspiracy to kidnap Annette Stevens. Mrs. Crowder testified that the O'Donnells told all their friends that they knew drug dealers with lots of money. Chuck said, "We can rob a drug dealer and they can't call the police." Mrs. Crowder knew that Chuck and his friends were watching the Stevenses and she went with them once.
Mrs. Crowder testified that Chuck asked her to make black ski masks for him and she did. He never told her what he planned to use them for. Mrs. Crowder also testified that her husband had caps in the garage that said "FBI" on them and underneath, in small writing, stated "Fuel Bladder Incorporated." The caps were black with white lettering.
According to Mrs. Crowder, on August 3, 1997, she and Chuck were going to Bonanza and he suggested they stop at Randy Clausing's house. The three of them decided to take a ride and ended up at Jackson Lake, where the Stevenses lived. When they heard someone come home, Chuck and Clausing told Mrs. Crowder to wait where she was. They left but returned approximately five minutes later and asked Mrs. Crowder to follow the truck they were riding in. She followed them to Clausing's property in Scioto County.
Mrs. Crowder went down to the trailer and soon thereafter Chuck and Clausing came into the trailer. Mrs. Crowder asked what was going on and the two men informed her that they had "a guy" out there. When Mrs. Crowder asked who it was, they told her it was the drug dealer that appellant knew. Mrs. Crowder testified that she left upon hearing that.
At approximately 10:30 or 11:00 p.m. that night, Chuck called and Mrs. Crowder returned to the Clausing residence. Chuck and Clausing told Mrs. Crowder they wanted her and Josh, Clausing's son, to drive back to the house at Jackson Lake and get a metal box out of the living room. Mrs. Crowder and Josh brought the locked box back from the Stevens residence and when Chuck and Clausing opened it, there was marijuana inside. Mrs. Crowder again returned to her residence.
The following morning, Chuck called Mrs. Crowder and asked her to return to the Clausing residence. He also asked her to call John Wooten, a friend who lives near the Crowders. Chuck called appellant and asked him to come over. Wooten, appellant, Chuck and Clausing went into the barn and Mrs. Crowder again left.
On cross-examination, Mrs. Crowder testified that Chuck was domineering and manipulative and that he used people. She testified that appellant told the Crowders that he knew a lot of drug dealers who were making a lot of money and he would like to get some of the action. Mrs. Crowder believed that appellant was trying to talk Chuck into "running drugs" with him and it appeared that Chuck was interested. She also heard appellant and Chuck talk about pretending to have Chuck pull Jim Stevens or Michael Pack over like they arrested him and having a lawyer draw up some phony papers. While the conversations were about robbing a drug dealer, none of them involved kidnapping the Stevenses. Mrs. Crowder testified that appellant wasn't present when the kidnapping took place and to her knowledge there was no plan for him to be involved in the kidnapping.
John Wooten
John Wooten testified that he pled guilty to obstructing justice for lying to FBI agents in May 1998 about the Stevens kidnapping. Wooten first heard about the Stevenses four or five months before they were kidnapped. Appellant mentioned that the Stevenses were drug dealers and had a lot of money. Chuck decided to try and find the money and rob the Stevenses. Chuck and appellant tried to find the money several times but had no luck so Chuck said, "Well, I'll just have him tell me where it's at." Wooten testified that he believes the kidnapping plan started from there and he was around appellant and others at least five times when they discussed getting money from the Stevenses. Most of these discussions took place in Chuck's garage but one may have taken place in Chuck's living room and one took place around the Stevens home in Jackson County.
On one occasion, Chuck and Wooten went to visit appellant and ended up going to the Stevens residence near Jackson Lake. Appellant stated that a known drug dealer came to the Stevenses' residence the prior evening and brought $15,000 or $20,000. The man told appellant to stay in the house. The man went outside but wasn't gone long so appellant thought he hid the money somewhere outside. Wooten, appellant and Chuck walked around the Stevens home. Chuck and appellant looked around, under some cars and places appellant believed that money was usually hidden. They didn't find any money and left.
Wooten testified that, at a later discussion, Chuck stated that if they didn't find the money, he would make Jim Stevens tell them where it was. Appellant asked what Chuck meant by that and Chuck responded that he'd just "grab him and he'll tell me where it's at." Wooten testified that appellant did not seem too keen on that idea and he thought it was more than what appellant wanted to do.
On August 4, 1997, Sharon Crowder called Wooten early in the morning. Wooten went to Clausing's trailer. After about a half-hour, Clausing and appellant came in. Chuck kept saying, "I've got them people out there" but Wooten did not believe him. Wooten, Chuck, appellant, Randy, and possibly Sharon Clausing went into the barn. It was dark but someone had a pen light and was shining it around. Clausing disappeared and Wooten heard a couple of grunts and someone say "you're hurting me." Wooten saw a lady lying in the seat of a pickup truck and Clausing punched her in the gut.
Chuck then opened a side door to the tool room and Wooten saw a guy laying there on a rug or a blanket, tied or chained to a pole. His mouth was untaped enough that he could talk a little. Chuck asked him, "Where is your money?" and the man replied, "I don't have any money." Chuck said, "I know you've got it. I've been told. Friends of yours have told and turned on you." Then Chuck got a wire and shocked the man once or twice. He then told the man he was going to go shock the lady if he didn't tell Chuck where the money was. The man finally said he had two keys to a storage bin. Appellant was walking back and forth between the truck and where the man was located.
Appellant kicked the man two or three times and Wooten told him not to do that. Approximately a week or two later, appellant told Wooten that he and the man had gotten into a fight with a bunch of guys before and the man took off and left appellant there to fight. The guys kicked and stomped him and appellant said that he kicked the man because it was "payback time." Wooten left after appellant kicked the man.
Later that evening, Sharon called Wooten and he went back to Clausing's residence. He and Chuck then drove to a storage bin in Jackson County. A Corvette was inside and Chuck went behind it and found a bank bag with some money in it. Wooten got $700 or $800 of the money but doesn't know what happened to the rest.
On cross-examination, Wooten testified that Chuck asked appellant a lot of questions about the Stevenses. He further testified that Chuck was the leader. Wooten also admitted that he never saw appellant shock the man or hit the woman and Chuck was in charge of what was going on in the garage. Wooten testified that both he and appellant were upset and anxious. Wooten does not know how much money was recovered from the storage bin or whether anyone else got any money. He never heard appellant say he was going to kidnap the Stevenses. Appellant did, however, state that he could get them away from their home at different times if Chuck and Clausing wanted to go look around for the money.
Josh Ratcliff
Josh Ratcliff testified that he is Randy Clausing's stepson. Ratcliff was present on one or two occasions when appellant, Clausing, and Chuck discussed kidnapping the Stevenses. One discussion was in a vehicle and they were talking about where Jim Stevens lived and when he was home. Other conversations took place in Chuck's garage. The men talked about money and drugs. One day prior to the kidnapping, Ratcliff, Chuck, Sharon and Clausing drove to the Stevens house and looked around.
On the evening of August 3, 1997, Ratcliff arrived home and was approached outside by Sharon. She told Ratcliff to go inside and change because they had to go somewhere. Sharon then drove Ratcliff to the Stevens house and they went inside to look for money. Ratcliff found a safe with marijuana in it and they returned to the Clausing residence. He gave the safe to Sharon and left. Ratcliff never went out to the barn.
On cross-examination, Ratcliff acknowledged that he could not recall the word "kidnapped" ever coming up in the conversations he heard. However, he did hear Chuck say they were going to "grab the guy." Ratcliff testified that the group talked about this every time he saw them around each other but they didn't know when to go get him. Some of the conversations took place when appellant was not present, but when appellant was around, he participated in the conversations and made no attempt to end the discussion. Appellant talked about the subject as much as the others did.
Randy Clausing
Randy Clausing testified that he is currently incarcerated for obstruction of justice because he covered up the death of Danny Trailer, who Chuck killed. Clausing stated that he was a friend of Chuck's but was also afraid of him because he was very violent. Chuck told Clausing that appellant knew people in Jackson who dealt in drugs and had a lot of money.
One day, Clausing, Chuck and Sharon went to appellant's house and discussed the Stevenses. Appellant wanted to tell the others their routine. The discussions were about when the group was going to try to abduct them. Chuck, Sharon and Clausing checked out the Stevens residence a couple times, including once when Ratcliff came along.
On one occasion, Chuck said that appellant and his wife were going to go out on a boat with the Stevenses and when they came back, the group was going to be waiting for them. Appellant was aware of this plan because it was discussed beforehand. While appellant, his wife, and the Stevenses were on the boat, Clausing, Chuck, and Sharon sat at the boat dock. When they saw the Stevenses get out of the boat, they went back to the house to wait for them.
Clausing, Chuck and Sharon were dressed in black clothes. Chuck and Clausing had masks that said "FBI" on the front and Sharon had a hood on, though Clausing cannot recall if it said "FBI" also. Chuck and Clausing stood behind the house and when the Stevenses came down the steps, Chuck and Clausing ran up and yelled, "FBI! You're under arrest." Both men had guns.
Chuck and Clausing then took the Stevenses into their house and put handcuffs on them and stockings over their heads so they couldn't see. Sharon then drove down to the house and the three looked through the house. Clausing found a small safe but did not know what was inside. Neither Sharon nor Chuck stated that they found anything.
They then took the Stevenses down the steps and put them in the back seat of Sharon's car. Clausing and Sharon rode in the front seat and Chuck followed in a red pickup truck. The group went to Clausing's property in Scioto County and took the Stevenses into a hollow. Chuck removed the Stevenses from the car, separated them, and tried to make Jim Stevens tell him where the money was. Clausing was watching Annette Stevens but could hear Jim Stevens screaming. Chuck then came down to talk with Annette and Clausing went to watch Jim. He then heard Annette screaming. When Clausing next saw Annette, her bathing suit was torn loose and she stated that he'd "stuck something up her." Clausing helped her get her clothes back on and told her to calm down.
The Stevenses were then taken down to the barn but Chuck still could not get them to say anything. He went into the house and called appellant and John Wooten to come over. After they arrived, the men continued trying to get the Stevenses to talk. Wooten acted like he was a dirty FBI agent and once they told him where the money was, he would let them go. Chuck was shocking the Stevenses with wires. Jim Stevens continued saying he didn't have any money and appellant kicked him a couple times. Appellant kept saying Jim was lying, that he had the money. Clausing had a pair of pliers and was squeezing Jim's finger. Finally, Jim stated that he had some money in a storage garage. Sharon had a sedative or valium and injected it into Jim's arm. Clausing did not see her inject Annette.
Appellant then left and Chuck and Wooten went to the storage building and came back with some money. They said there was around $11,000 there but Jim said it was $27,000 or $30,000. When it got dark, Clausing helped drive the Stevenses to an area not far from their home. Chuck drove their truck with Annette in the front with him. Jim was laying in the back with Clausing. The Stevenses were given sedatives to take before leaving Clausing's property. Chuck and Clausing left their truck about a half-mile from their home. Sharon and Wooten followed in another car to drive Clausing and Chuck back.
On cross-examination, Clausing testified that appellant was at the barn for approximately an hour. Appellant never spoke to the Stevenses but told Wooten what to ask them. Clausing did not actually hear Chuck call appellant but he said he called him.
Clausing acknowledged that Chuck planned the kidnapping and appellant did not participate in the actual kidnapping or the return of the victims. Clausing also stated that it appeared that Chuck was trying to draw appellant into the plan. At one point, Chuck asked to use appellant's gun and appellant refused. Clausing received about $3000 but to his knowledge, appellant never received anything.
On re-direct examination, Clausing testified that appellant knew the Stevenses were going to be taken when they got back from boating and he expected them to be at the Clausing residence when he came over.
On re-cross examination, Clausing testified that Chuck told him prior to the kidnapping that he had an arrangement with appellant and that was what was going down. Clausing conceded that everything he knows about appellant's involvement came from Chuck and that Chuck sometimes lied.
Terry Leonard
Terry Leonard testified that he was a neighbor of the Stevenses near Lake Jackson. At some point prior to August 3, 1997, Leonard was visiting with a neighbor when he saw a dark-colored pick-up truck pull into the Stevenses' driveway. It sat there for about 15-20 minutes and left. Then a white car pulled up with three men in it and two of them got out. Leonard and the neighbor went to see what was going on because they knew the Stevenses weren't home. They observed two men running towards the Stevens house.
Leonard went to his house and called 911. However, by the time the police arrived, the white car had picked up the individuals and driven away quickly. The vehicle's occupants all had black hats on that said "FBI." Leonard never saw the car around there again.
Monty McCain
Monty McCain testified that he lived near the Stevenses in 1997. During that summer, he observed two men get out of a truck at the house next to the Stevenses'. McCain drove by the Stevens house and saw two guys run away behind a vacant house. McCain saw a car on the road with a man in it wearing a FBI hat.
Ann Crabtree
Ann Crabtree testified that she lived near the Stevenses. On August 4, 1997, Crabtree was sitting on the couch when someone crashed into the tree outside. She yelled towards the truck, asking if they wanted to use the phone, but heard no answer. Crabtree called Jim Stevens to see if he could pull the truck out but there was no answer. She then looked up on the road and heard a female say "Ann?" at which time Crabtree realized it was Annette Stevens. Annette looked like she'd been in the wreck. She said that Jim was in the truck and started walking home. When Crabtree asked who did this to her, Annette replied that she had to go home because the FBI told her to go home. Crabtree called her husband and Dave McCain to come get Jim. Dave McCain lifted Jim out of the truck and took him home. When Crabtree asked him who had done this, he stated it was the FBI. Everything in the Stevenses' house was torn apart.
The following day, Crabtree saw that Jim had marks all over his arms. He said they'd given him shots and his arms were cut up from where they tied him up. Annette had marks all over her too.
On cross-examination, Crabtree testified that the Stevenses went to the O'Donnells' house after the kidnapping to be safe and stayed there for about a week. The Stevenses moved to Arkansas shortly thereafter.
Bruce Meyers
Bruce Meyers testified that he is a lieutenant with the Licking County Sheriff's Department. He investigated the February 16, 1998 kidnapping of Michael Pack. He first became aware of Pack's kidnapping on February 17, 1998 when Lori Shortridge called his office. Shortridge lived across the street from Pack. When Pack's mother went to his house, she discovered a considerable amount of blood in the garage and went to Shortridge's house. The investigation revealed that Pack was taken to Chuck Crowder's residence in Portsmouth where he was mostly kept in a van inside an unattached garage. Pack's wife received a ransom demand and an exchange of Pack for $50,000 in Circleville was arranged. Pack was recovered at that exchange on February 18, 1998. He was badly beaten. Four individuals were arrested at the exchange — Sharon Crowder, Charles O'Dell, Betty O'Donnell and appellant. Tricia Caywood and Chuck Crowder were arrested later but the money was never recovered.
Appellant pled guilty to kidnapping and complicity to extortion for his role in the kidnapping and Lieutenant Meyers conducted fairly extensive interviews with appellant during which he talked about the Stevens kidnapping. Appellant stated that Chuck called him to come to Clausing's home and when he arrived there he found Annette and Jim Stevens. Appellant also stated that he witnessed some physical abuse to the Stevenses. He did not indicate that he tried to help them but inferred that he was surprised they were there. Appellant also stated that Chuck threatened him when he went to Chuck's house after kidnapping Pack. Chuck pulled a revolver from his pants and told appellant he had to stay until he got rid of Pack.
Appellant participated in several aspects of the Pack kidnapping after being called to Chuck's house. He traveled to some storage buildings in Columbus where there was supposed to be a large quantity of marijuana. Also, Chuck lost some evidence, apparently a syringe used on Pack, when he kidnapped him. Appellant went to Pack's house to recover the syringe. Appellant also traveled to the Pack home in Mt. Vernon and dug around the backyard looking for $50,000 that was buried there.
On cross-examination, Lieutenant Meyers acknowledged that appellant has continuously asserted his innocence as to the Stevens kidnappings.
Paul Blaine
Paul Blaine testified that he is a detective with the Scioto County Sheriff's Department. Detective Blaine testified that the body of Danny Trailer was recovered on Clausing's property and that Clausing was charged with obstructing justice for hiding Trailer's death.
The FBI informed Detective Blaine that the Stevenses were held on the Clausing property. Clausing eventually gave statements regarding the Stevens kidnapping and hundreds of hours of Chuck Crowder's phone calls from the penitentiary and conversations with Clausing were recorded. When Clausing was confronted with these recordings, he agreed to testify. Based on his grand jury testimony, indictments of Sharon Crowder, appellant and John Wooten were obtained.
On cross-examination, Detective Blaine acknowledged that the death of Danny Trailer was not connected to appellant.
Annette Stevens
Annette Stevens testified that she is currently living in Buckville, Arkansas but in the summer of 1997 she lived close to Jackson Lake with her husband, Jim Stevens. Annette acknowledged that Jim was involved in drug trafficking at the time and he sometimes had large amounts of money. Annette testified that she knows appellant and that he was a lifelong friend of her husband's.
Appellant and his wife were frequently at the Stevens home. Appellant knew that Jim was involved in drugs and had large sums of money. The Stevenses also knew Michael Pack. Pack tended to wear a lot of jewelry and it was obvious that he had extra money to spend. Appellant told Jim that they should rob Pack but Jim told him he wouldn't because Pack was his friend. On two other occasions, appellant asked Annette to participate in the robbery but she told him she didn't want to be involved. Betty O'Donnell was present during these conversations.
Approximately a month before she was kidnapped, Annette began to see people dressed in black with FBI on their clothing around her house. The people appeared to be stalking the Stevenses and Annette told Jim she didn't believe law enforcement would be on their property like that. Appellant told the Stevenses that some FBI agents stopped him and questioned him about Jim. Appellant also told Jim he knew an attorney who could help him find out if he was under investigation. Appellant took Jim to the attorney's office and Jim gave the attorney $8000. However, no formal charges were ever filed.
On August 3, 1997, either Jim or Annette called the O'Donnells and asked if they wanted to go boating on the Ohio River, which they did. After finishing boating, the O'Donnells indicated they didn't want to go to the Stevenses' home. Annette thought this was unusual because this was the first time they didn't return to the Stevens residence after boating.
Annette and Jim then went to the grocery store and were walking down the steps to their home when they were approached by some "FBI agents" who showed Jim their badges and a "warrant." The agents walked Jim and Annette down the steps, pointing a long gun and a handgun at them. One of them went immediately to Annette's jewelry box. The agents duct taped the Stevenses' eyes and handcuffed them.
Annette stated that two men and a woman were present. One of the men had a rugged-sounding, unhealthy voice. The woman was not fat but had a round figure and the other man was taller than the first. Annette could not see their faces because they had masks on with "FBI" on the top. The "agents" stated that the Stevenses were under arrest and they were searching the house.
After a short period of time, the woman led Annette out of the house and into the back seat of a vehicle. There were two men in the front seat and Annette heard them say "we've got them" into a walkie-talkie or something. Annette and Jim were taken to a farm and removed from the vehicle. The tape on Annette's eyes loosened and she saw a few cars in the area and five or six people. As soon as they were removed from the vehicle, someone began injecting Annette and Jim with drugs that made Annette feel like she would pass out.
Annette and Jim were then separated and Annette could hear them electrocuting Jim. Annette's feet were beaten, she was knocked down, her face was stomped on, and she was punched in the stomach. Annette's clothes were then removed and she was beaten in the head with a gun, causing her eardrum to bust, a bloody nose and black eyes. Someone then took pliers and twisted Annette's breasts. Annette heard Jim screaming. The kidnappers stated that they wanted money. They threatened to kill Annette and bury her alive. They also put her in a body bag and started up what sounded like a backhoe.
Jim and Annette were then taken into a barn and again separated. They left Annette in the truck with someone to watch her. The person who watched her usually fondled and hit her. Annette testified that she got away two or three times. On one of these occasions, Annette saw appellant but she did not recognize the other individuals. Appellant did not do or say anything when she saw him. After she escaped, Annette was beaten more severely.
Finally, Jim told the kidnappers where the money was located but they continued the torture for many more hours. Someone gave Annette some pills and told her to take them or she wouldn't get out alive. Annette was placed in the front of the truck and Jim was placed in the back. When she awoke, she could hardly walk and tried to wake Jim to drive home. When she couldn't wake him, she attempted to drive home and crashed into her neighbor's tree. Her neighbor wanted to give her a ride home but Annette was afraid to go with her so she walked home. Annette asked her neighbor to get Jim out and not to call the police. Annette testified that she didn't want the police called because she didn't feel the law would help and she didn't want her mother or her son to find out.
Appellant and his wife invited Jim and Annette to stay at their house, saying it would be safe there. Annette told appellant that she saw him when she got loose, but he denied that it was him.
On cross-examination, Annette admitted that she was out pending appeal of her conviction for murdering Jim. She also testified that she told the FBI she believed she'd been taken to Mitch Weber's property when she was kidnapped. She learned she was wrong after she read about the Pack kidnapping.
Annette also testified that once when she escaped, she went to find Jim and saw him on his knees in the barn. He was tied to something in the ground and she attempted to get him loose. A man came in and pointed a gun at Annette's head and said that if she didn't cooperate he would blow her head off.
Annette testified that it was Jim's idea to stay with appellant and Betty. She testified that she felt uncomfortable staying there because appellant kept watching a video about torturing people. She and Jim only stayed with them for two nights and then stayed at a motel. Shortly after the kidnapping, they moved to Arkansas. However, they did return to Jackson County to visit and stayed with appellant once or twice. Annette testified that she never wanted to believe it was appellant in the barn.
Betty O'Donnell
Betty O'Donnell testified that on August 3, 1997, she and appellant stopped by the Stevenses' house in the morning. Jim wasn't home but Annette was and she suggested that they all go boating and meet at the boat in a short while. Betty and appellant went home to get ready. While Betty was getting ready, Sharon Crowder telephoned and invited the O'Donnells over for dinner. Betty told her they couldn't come over because they had plans with the Stevenses. After boating all day, the O'Donnells went home, ate, watched television and went to bed.
Betty acknowledged that she knew about the Stevenses' drug involvement. She testified that Jim always had marijuana and people would come to his house to buy it. She admitted telling Chuck that Jim sold marijuana and, though Chuck asked questions about it, Betty never really thought anything about it.
On August 4, 1997, Sharon Crowder called and wanted to know where appellant was. Betty told her he was still in bed and Sharon said that Chuck wanted to talk to him and he should call when he awoke. About fifteen minutes later, Chuck called and told Betty to wake appellant up. Betty woke appellant and she heard him tell Chuck he'd be over in a little bit. Appellant told Betty that a new race car had come in and they wanted him to come see it. Appellant returned a short time later and worked outside for the rest of the day.
On August 5, 1997, the O'Donnells went to Wellston and decided to stop at the Stevenses' house. Jim and Annette both looked bad and had marks on them. Jim said they'd been kidnapped and tortured and he thought Annette had been raped. Annette told Betty what happened to her but never said she recognized anyone. Jim said he looked underneath the duct tape and saw Mitch Weber but Betty did not know who that was.
Jim and Annette stayed with the O'Donnells for about two weeks after that. Betty suggested they talk to the police but they didn't want to do that so Betty said they should call the FBI. Jim and Annette talked to the FBI and told them they thought Mitch Weber was involved.
After they moved to Arkansas, Jim and Annette would come back at least once a month and would bring marijuana with them. Jim asked the O'Donnells to store a couple hundred pounds of marijuana in a building they owned but Betty refused. After this, the Stevenses stopped staying with the O'Donnells.
One day prior to the kidnapping, Chuck, Clausing and Wooten came over and sat on the porch talking to appellant. Betty heard a gun shot and saw Clausing by the trunk of his car, holding a shotgun. She heard Chuck ask appellant for his shotgun and a hacksaw blade but he refused to give it to him. Appellant said he didn't want any part of it.
On another day, the O'Donnells went to Chuck's house and he said he wanted to show them something. They went to the garage and Betty saw a van. When Chuck slid the van door back, Betty saw someone tied up with a black hood over his head. She learned it was Michael Pack. Betty later pled guilty to complicity to extortion.
On cross-examination, Betty testified that appellant didn't tell her for seven months that he knew anything about the Stevens kidnapping. She also admitted participating in the Pack kidnapping by driving the car which Chuck ultimately got away in and by holding a ladder for Chuck while he climbed up it and put cable through a hole, probably to hoist Pack up.
Donald Samples
Donald Samples testified that he is Betty O'Donnell's son. He visited his mother in August 1997 and saw Jim and Annette Stevens there. The Stevenses appeared scarred up and jittery and Jim said he thought Mitch had kidnapped them.
Samples was also there when Chuck and two other guys came over. Samples heard a shot and heard Chuck ask for appellant's gun and a hacksaw. Appellant said, "No. I don't want nothing to do with it." Then Chuck and the other two guys left.